**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 14-11277-JAD |
| | : | |
| **TRUSTEES OF CONNEAUT LAKE PARK, INC.,** | : | Chapter 11 |
| | : | |
| Debtor. | : | |
| | : | |
| **TRUSTEES OF CONNEAUT LAKE PARK, INC.**, | : | Adv. Proc. No. 16-01029 JAD |
| | : | |
| Plaintiff, | : | Document No. |
| | : | |
| v. | : | Related to Doc. No. 7 |
| | : | |
| **PARK RESTORATION, LLC**, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**I.    Summary**

The Trustees of Conneaut Lake Park, Inc., Inc., debtor and debtor-in-possession, commenced an Adversary Proceeding on June 13, 2016, against Park Restoration, LLC, alleging breach of contract claims: Failure to Vacate the Beach Club without Damage;[1] Failure to Secure Beach Club in Commercially

---

[1] Count I of the Complaint, Adv. Case 16-01029-JAD, Adv. Dkt. No. 1 (the "**Complaint**").

Reasonable Manner;[2] and Contractual Indemnity.[3]  In each of the three Counts, the Plaintiff alleges "damages as a result of the Defendant's breach of Management Agreement in an amount not less than the full value of the Beach Club."  This is the second adversary proceeding between these Parties (among others) filed in this Bankruptcy Case.  In the first Adversary Proceeding, the Defendant herein sought title to certain insurance proceeds resulting from the destruction of the Beach Club, while the Debtor and certain Taxing Authorities asserted rights in the insurance proceeds.  The insurance proceeds, $611,000.00, ("**Insurance Proceeds**"), which are the subject of the *first* Adversary Proceeding, were deposited into this Court's Registry.

Contemporaneous with the filing of the Complaint, the Debtor filed a Motion for Preliminary Injunction, which Motion is the subject of this Memorandum Opinion.  The Defendant filed its response to the Motion, and after briefing and argument, this matter is now ripe for determination.

For the reasons set forth below, the Court shall enter an order denying the preliminary injunction.

## II.  Background

The background of the disputes between these parties is briefly summarized as follows. [4]  The Plaintiff presently holds, in trust for the use of the

---

[2] Count II of the Complaint.
[3] Count III of the Complaint.
[4] Additional background can be found in this Court's Memorandum Opinion filed at Adv. No. 15-1010-JAD, Dkt. No. 82.

general public, 208.213 acres of land and the improvements thereon (the "**Real Property**") located in Crawford County, Pennsylvania. Prior to 2014, a building, commonly referred to as the "Beach Club," was located on part of the Real Property. The Plaintiff and the Defendant were parties to the Beach Club Management Agreement dated on or about November 24, 2008 (the "**Management Agreement**"), pursuant to which the Defendant agreed to provide operational and management services for the Beach Club.[5] According to the Management Agreement, the Defendant agreed that its management services: (a) "include all services and functions necessary to insure that the Beach Club is a fully operational and full service club offering services commensurate with other commercially similar clubs," and (b) "include, but [are] not limited to, physical control and security, all maintenance at the facility, food and beverage, insuring that the property is fully secured and maintained in a commercially reasonable fashion." From at least November 2008 through and including August 1, 2013, Defendant was in possession of, used, and occupied the Beach Club. On August 1, 2013, the Beach Club was destroyed by fire. By letter dated March 20, 2015, the Plaintiff, among other things, advised Defendant that all of its right, title, and interest in the Management Agreement terminated when the fire occurred.

The gist of the Complaint is that because the Beach Club was on the Real Property owned by the Plaintiff, the failure of the Defendant to "return" the Beach

---

[5] A copy of the Management Agreement is attached as Exhibit A to the Complaint.

Club in good condition to the Plaintiff at the termination of the Management Agreement, was a breach of the Management Agreement, for which the Plaintiff is entitled to damages.

Failing to obtain an interest in the Insurance Proceeds in the first Adversary Proceeding,[6] the Debtor now seeks a preliminary injunction "enjoining disbursement of the Insurance Proceeds pending resolution of this Adversary Action and granting such further relief as this Court deems just and proper."[7]

### III. Analysis

The first question this Court must answer is, whether, in an action for money damages, this Court has the power to issue a preliminary injunction preventing the Defendant from use of assets in which the Plaintiff has no lien or equitable interest. The United States Supreme Court has found that no such power exists under the law. Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999).

### A. Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.

---

[6] In the Memorandum Opinion issued by this Court, I found that the Taxing Authorities were entitled to be paid first from the Insurance Proceeds, the balance to the Defendant herein. In reversing, the District Court found that all of the Insurance Proceeds were payable to the Defendant herein (Park Restoration, LLC v. Summit Township, et al., (In re Trustees of Conneaut Lake Park, Inc.), Civil Action No. 1:16-cv-00006-BJR (W.D. Pa. May 4, 2016). Neither Court found in favor of the Debtor nor is the Debtor a party to the pending appeal before the Court of Appeals.

[7] Motion for Preliminary Injunction, Adv. No. 16-01029, Adv. Dkt. No. 7.

The disposition of the Motion for Preliminary Injunction is controlled by the decision of the United States Supreme Court in <u>Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999). Below is a summary of the pertinent facts and application of the law as recited in <u>Grupo</u>:

> Grupo Mexicano de Desarrollo, S. A. (GMD), was a Mexican holding company. In 1994, GMD issued $250 million of 8.25% unsecured, guaranteed notes due in 2001 (Notes), which ranked pari passu in priority of payment with all of GMD's other unsecured and unsubordinated debt. Interest payments were due in February and August of every year. Between 1990 and 1994, GMD was involved in a toll road construction program sponsored by the Government of Mexico. Problems in the Mexican economy resulted in severe losses for the concessionaries, who were therefore unable to pay contractors like GMD. In response to these problems, in 1997, the Mexican Government announced the Toll Road Rescue Program, under which it would issue guaranteed notes (Toll Road Notes) to the concessionaries, in exchange for their ceding to the Government ownership of the toll roads. The Toll Road Notes were to be used to pay the bank debt of the concessionaries, and also to pay outstanding receivables held by GMD and other contractors for services rendered to the concessionaries (Toll Road Receivables). In the fall of 1997, GMD announced that it expected to receive approximately $309 million of Toll Road Notes under the program.
>
> By mid-1997 GMD was in serious financial trouble. In addition to the Notes, GMD owed other debts of about $450 million. As a result of these financial problems, neither GMD nor its subsidiaries (who had guaranteed payment) made the August 1997 interest payment on the Notes. Between August and December 1997, GMD attempted to negotiate a restructuring of its debt with its creditors. On October 28, GMD publicly announced that it would place in trust its right to receive $17 million of Toll Road Notes, to cover employee compensation payments, and that it had transferred its right to receive $100 million of Toll Road Notes to the Mexican Government (apparently to pay back taxes). GMD also negotiated

5

with the holders of the Notes to restructure that debt, but by December these negotiations had failed.

On December 11, certain noteholders (hereafter the 'respondents') accelerated the principal amount of their Notes, and, on December 12, filed suit for the amount due in the United States District Court for the Southern District of New York (petitioners had consented to personal jurisdiction in that forum). The complaint alleged that 'GMD is at risk of insolvency, if not insolvent already;' that GMD was dissipating its most significant asset, the Toll Road Notes, and was preferring its Mexican creditors by its planned allocation of Toll Road Notes to the payment of their claims, and by its transfer to them of Toll Road Receivables; and that these actions would 'frustrate any judgment' respondents could obtain. Respondents sought breach-of-contract damages of $80.9 million, and requested a preliminary injunction restraining petitioners from transferring the Toll Road Notes or Receivables. On that same day, the District Court entered a temporary restraining order preventing petitioners from transferring their right to receive the Toll Road Notes.

On December 23, the District Court entered an order in which it found that 'GMD is at risk of insolvency if not already insolvent;' that the Toll Road Notes were GMD's 'only substantial asset;' that GMD planned to use the Toll Road Notes 'to satisfy its Mexican creditors to the exclusion of [respondents] and other holders of the Notes'; that '[i]n light of [petitioners'] financial condition and dissipation of assets, any judgment [respondents] obtain in this action will be frustrated'; that respondents had demonstrated irreparable injury; and that it was 'almost certain' that respondents would succeed on the merits of their claim. . . . It preliminarily enjoined petitioners 'from dissipating, disbursing, transferring, conveying, encumbering or otherwise distributing or affecting any [petitioner's] right to, interest in, title to or right to receive or retain, any of the [Toll Road Notes].' . . . The court ordered respondents to post a $50,000 bond. The Second Circuit affirmed. 143 F.3d 688 (1998). We granted certiorari, 525 U.S. 1015 (1998).

Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc., 527 U.S. 308,

311-313, 119 S. Ct. 1961, 1965, 144 L. Ed. 2d 319, 327 (1999).

6

Justice Scalia framed the issue: "This case presents the question whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets *in which no lien or equitable interest is claimed*."[8]

In Grupo, the preliminary injunction had become permanent before the Supreme Court considered the appeal, and the respondents considered the appeal therefore moot. In its analysis, the Supreme Court compared the "usual preliminary injunction" – to enjoin action that was sought to be declared "unlawful," with the request by the noteholders – to enjoin an action that was valid and lawful pending the outcome of litigation:

> In the case of the usual preliminary injunction, the plaintiff seeks to enjoin, pending the outcome of the litigation, action that he claims is unlawful. If his lawsuit turns out to be meritorious--if he is found to be entitled to the permanent injunction that he seeks-- even if the preliminary injunction was wrongly issued (because at that stage of the litigation the plaintiff's prospects of winning were not sufficiently clear, or the plaintiff was not suffering irreparable injury) its issuance would in any event be harmless error. The final injunction establishes that the defendant should not have been engaging in the conduct that was enjoined. Hence, it is reasonable to regard the preliminary injunction as merging into the final one: If the latter is valid, the former is, if not procedurally correct, at least harmless. A quite different situation obtains in the present case, where (according to petitioners' claim) the substantive validity of the final injunction does not establish the substantive validity of the preliminary one. For the latter was issued not to enjoin unlawful conduct, but rather to render unlawful conduct that would otherwise be permissible, in order to protect the anticipated judgment of the court; and it is the essence of petitioners' claim that

---

[8] Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 310, 119 S. Ct. 1961, 1964, 144 L. Ed. 2d 319, 326 (1999)(emphasis added).

7

such an injunction can be issued only after the judgment is rendered. If petitioners are correct, they have been harmed by issuance of the unauthorized preliminary injunction--and hence should be able to recover on the bond--even if the final injunction is proper. It would make no sense, when this is the claim, to say that the preliminary injunction merges into the final one.[9]

Having determined that the failure of the petitioners to appeal the permanent injunction does not forfeit their claim that the preliminary injunction was wrongful, the Supreme Court then considered the question that is the issue squarely before this Court: Whether the Court has the authority to issue the preliminary injunction pursuant to F.R.Civ.P. 65.

> The Judiciary Act of 1789 conferred on the federal courts jurisdiction over 'all suits . . . in equity.' §11, 1 Stat. 78. We have long held that '[t]he 'jurisdiction' thus conferred . . . is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries.' Atlas Life Ins. Co. v. W. I. Southern, Inc., 306 U.S. 563, 568 (1939). See also, e.g., Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 382, n. 26 (1949); Guaranty Trust Co. v. York, 326 U.S. 99, 105 (1945); Gordon v. Washington, 295 U.S. 30, 36 (1935). 'Substantially, then, the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73).' A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928). '[T]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by [Rule 65] and depend on traditional principles of equity jurisdiction.' 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2941, p. 31 (2d ed. 1995). We must ask, therefore, whether the relief respondents requested here was traditionally accorded by courts of equity.

---

[9] Id., at 527 U.S. 308, 315.

> Respondents do not even argue this point. The United States as amicus curiae, however, contends that the preliminary injunction issued in this case is analogous to the relief obtained in the equitable action known as a 'creditor's bill.' This remedy was used (among other purposes) to permit a judgment creditor to discover the debtor's assets, to reach equitable interests not subject to execution at law, and to set aside fraudulent conveyances. [internal citations omitted] It was well established, however, that, as a general rule, a creditor's bill could be brought only by a creditor who had already obtained a judgment establishing the debt. [internal citations omitted] The rule requiring a judgment was a product, not just of the procedural requirement that remedies at law had to be exhausted before equitable remedies could be pursued, but also of the substantive rule that a general creditor (one without a judgment) had no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property. As stated by Chancellor Kent: 'The reason of the rule seems to be, that until the creditor has established his title, he has no right to interfere, and it would lead to an unnecessary, and, perhaps, a fruitless and oppressive interruption of the exercise of the debtor's rights.' [internal citations omitted].

Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 320, 119 S. Ct. 1961, 1969, 144 L. Ed. 2d 319, 332 (1999).

The Supreme Court reviewed it's decision in De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212 (1945), where United States sought a preliminary injunction restraining the defendants from removing their assets from this country pending adjudication of the merits of its complaint which sought equitable relief against alleged antitrust violations. In concluding that the injunction was beyond the power of the District Court, the Supreme Court stated:

'[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally,' but that the injunction in that case dealt 'with a matter lying wholly outside the issues in the suit.' Id., at 220. We pointed out that 'Federal and State courts appear consistently to have refused relief of the nature here sought,' and we concluded:

> To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence. Id., at 222-223.

The statements in the last two sentences, though dictum, confirms that the relief sought by respondents does not have a basis in the traditional powers of equity courts.

Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 327, 119 S. Ct. 1961, 1972, 144 L. Ed. 2d 319, 336 (1999).

The requirement that the creditor obtain a prior judgment is a fundamental protection in debtor-creditor law--rendered all the more important in our federal system by the debtor's right to a jury trial on the legal claim. There are other factors which likewise give us pause: The remedy sought here could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available? More

importantly, by adding, through judicial fiat, a new and powerful weapon to the creditor's arsenal, the new rule could radically alter the balance between debtor's and creditor's rights which has been developed over centuries through many laws--including those relating to bankruptcy, fraudulent conveyances, and preferences. Because any rational creditor would want to protect his investment, such a remedy might induce creditors to engage in a 'race to the courthouse' in cases involving insolvent or near-insolvent debtors, which might prove financially fatal to the struggling debtor.

Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 331, 119 S. Ct. 1961, 1974, 144 L. Ed. 2d 319, 338 (1999).

After reviewing the legal history of pre-judgment attachment under early English law, the Supreme Court decided that "such a remedy was historically unavailable from a court of equity," and would create a "new rule [that] could radically alter the balance between debtor's and creditor's rights." Therefore, the Supreme Court held the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." Id.

> 'A federal court has no authority generally to freeze a defendant's funds to help ensure satisfaction of a judgment should the plaintiff prevail on an underlying legal claim.' F.T. Int'l, Ltd. v. Mason, No. 00–5004, 2000 U.S. Dist. LEXIS 14601, at *3 (E.D.Pa. Oct. 5, 2000) (citing Grupo Mexicano De Desarrollo v. Alliance Bond Fund, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999)). 'A court also has no authority in any event to freeze assets in an amount which exceeds that recoverable in the underlying action.' F.T. Int'l, Ltd., 2000 U.S. Dist. LEXIS 14601 at *3 (citing Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 198–99 (3d Cir.1990)). 'Aside from the traditional showing necessary to obtain preliminary injunctive relief, a plaintiff may obtain a prejudgment freeze on a defendant's assets only if he has asserted a cognizable

Case 16-01029-JAD    Doc 25    Filed 08/01/16    Entered 08/01/16 16:14:29    Desc Main
                          Document      Page 12 of 18

equitable claim, has demonstrated a sufficient nexus between that claim and specific assets of the defendant which are the target of the injunctive relief, and has shown that the requested interim relief is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed.' F.T. Int'l, Ltd., 2000 U.S. Dist. LEXIS 14601 at *3–4.

Akers v. Akers, No. 5:15-CV-2512, 2015 WL 4601155, at *2 (E.D. Pa. July 31, 2015).

**B.    Strouse Greenberg Properties VI Limited Partnership et al. v. CW Capital Asset Management LLC et al.**

In support of its position that this Court has the authority to issue a preliminary injunction with respect to the Insurance Proceeds, the Plaintiff primarily relies on Strouse Greenberg Properties VI Limited Partnership et al. v. CW Capital Asset Management LLC et al., 442 F.Supp.2d 313 (E.D. La. 2006). The background of Strouse is as follows:  Strouse Greenberg Properties VI Limited Partnership (Strouse Greenberg) and Oak Island II Limited Partnership (Oak Island Partnership) filed a complaint for declaratory judgment against CWCapital Asset Management LLC (CW Capital), successor in interest to CRIIMI MAE Services Limited Partnership, and LaSalle Bank National Association (LaSalle Bank).  Strouse Greenberg was the owner of a 426-unit apartment complex located in New Orleans, Louisiana (Oak Island I).  Oak Island Partnership was the owner of the Oak Island II Apartments (Oak Island II).  CW Capital was the special servicer for LaSalle Bank, as trustee for the Registered Holders of Mortgage Capital Funding, Inc., Commercial / Multifamily Mortgage Pass-Through Certificates, Series 1997-MCI (the "**Trust**").  The Trust was the

12

owner and holder of two Multifamily Notes and Addendum to Multifamily Notes (the Strouse Note and the Oak Island Partnership Note), dated November 13, 1996, in the principal amounts of $3,361,000 (the Oak Island I loan), and $3,840,000 (Oak Island II loan) made payable to The Patrician Financial Company. **In addition to a mortgage on the property, the contracts assigned to the Trust all proceeds of the hazard and title insurance as additional collateral and provided the Trust with the exclusive option to hold all proceeds of the insurance policies**. The mortgages each contain cross-collateralization and cross-default provisions such that security for one loan is security for the other and a default on one loan is a default on the other. Hurricane Katrina destroyed Oak Island I and II.

>Oak Island I was covered by a $5,000,000 FEMA Standard Flood Insurance Policy. Without the knowledge of the Trust, in November 2005, Strouse Greenberg received 40 checks totaling $5,000,000 in compensation for damage to Oak Island I. All but one of the policies listed the Trust, as mortgagee/loss-payee. Thirty-eight of the checks ($4,750,000) were two-party checks payable to Strouse Greenberg and the Trust's agent; two checks in the amount of $250,000 were payable to only Strouse Greenberg. Without the Trust's authorization, Strouse Greenberg negotiated 39 of the 40 checks: 38 two-party checks and one check payable only to Strouse Greenberg. One additional check is missing.
>
>On February 1, 2006, Strouse Greenberg informed the Trust that it had received the checks. When Strouse Greenberg refused to turn over the proceeds to the Trust, the Trust declared both the Oak Island I and Oak Island II mortgage loans to be in default on February 6, 2006, and accelerated both loans on February 27, 2006. The outstanding balance for the two loans is approximately $6.8 million. Strouse Greenberg and Oak Island Partnership filed a complaint for declaratory judgment, seeking a declaration that the defendants 1) are not entitled to accelerate the loans, 2) are not entitled to the insurance

>proceeds, 3) are not entitled to a prepayment premium, and 4) are entitled to no more than payment of the balance of the Oak Island I loan less any monies held in escrow. CWCapital filed an answer on its own behalf and on behalf of the Trustee and the Trust (collectively the Trust), a counterclaim against Strouse Greenberg and Oak Island Partnership, and a third-party complaint against Samuel M. Switzenbaum as guarantor. The counterclaim and third-party complaint allege claims of breach of contract and civil conversion. The court denied the Trust's motion for a temporary restraining order and held a hearing on the motion for a preliminary injunction.

Id., at 315.

The Trust argued that it was entitled to a preliminary injunction against Strouse Greenberg to preclude the borrower from spending the insurance proceeds or exposing the proceeds to other creditors without the knowledge or consent of the Trust. Strouse Greenberg contended that relevant loan document between it and the Trust, did not require that the insurance proceeds from the FEMA policies be delivered to the Trust because "Covenant 5 refers only to the Lexington Insurance Company policy and does not include the FEMA flood insurance policy, which Strouse Greenberg voluntarily purchased in addition to the coverage required by the contract." Strouse Greenberg Props. VI LP v. CW Capital Asset Mgmt. LLC, 442 F. Supp. 2d 313, 316 (E.D. La. 2006). Alternatively, Strouse Greenberg argued that, "even if the loan documents authorize the Trust to hold the insurance proceeds, the Trust is required to apply the proceeds to the restoration of the damaged property because, as long as Strouse Greenberg continues to make payments on the notes and restoration of the damage is economically feasible, there is no 'default' which would trigger the cross-collateralization and cross-default provisions of the contract." Id.

14

The Trust argued that it would suffer irreparable harm if injunctive relief were not granted, and that it was entitled to the injunctive relief as "a widely recognized exception to the rule against issuing an injunction to preserve money damages is when the property restrained is the subject of the lawsuit."

> 'A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally.' In re Fredeman Litigation, 843 F.2d 821, 825 (5th Cir. 1988) (quoting DeBeers Consolidated Mines v. United States, 65 S.Ct. 1130, 1134 (1987)). '[A]n injunction may issue to protect assets that are the subject of the dispute or to enjoin conduct that might be enjoined under a final order.' Id. at 827. In each of the cases in which courts have restrained or enjoined the disbursement of funds, 'the assets frozen were in some way the subject of the litigation.' Id.

Strouse Greenberg Props. VI LP v. CW Capital Asset Mgmt. LLC, 442 F. Supp. 2d 313, 320 (E.D. La. 2006).

After reviewing the evidence, the court found the loan documents required that Strouse Greenberg purchase the insurance, and the Lender, as attorney in fact for the Borrower, would collect and receive the insurance proceeds and apply the insurance proceeds, at Lender's option, to the reconstruction of the property or to the loan balance. In addition to a mortgage on the property, the contracts assigned to the Trust all proceeds of hazard and title insurance as additional collateral and provided the Trust with the exclusive option to hold all proceeds of the insurance policies. Further finding the insurance proceeds were the subject to the dispute, the court granted the injunction as an appropriate remedy.

**C.  Whether the Court has the Authority to Issue the Preliminary Injunction pursuant to F.R.Civ.P. 65?**

As in Grupo Mexicano, this Motion for Preliminary Injunction presents the question whether, in an action for money damages, this Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien exists and which alleged equitable interest is not the subject of the dispute.[10]

The Plaintiff declares that the "Insurance Proceeds in this case are related to the dispute, and an injunction against their dissipation is permissible. The very agreement giving rise to the Defendant's pecuniary interests and capacity to procure the Policy and receive the Insurance Proceeds is the Agreement that is the subject of this litigation. Even more fundamentally, the Insurance Proceeds represent the replacement value for the loss of the building structure that the Defendant warranted to the Plaintiff it would vacate without damage."[11]

In Strouse Greenberg, the case relied on by the Plaintiff in support of its position, the lawsuit was brought by the Strouse Greenberg to determine the rights in the insurance proceeds. The court concluded, with ample evidence, the loan agreements provided the lender with a lien on the proceeds, expressly required the borrower to purchase the insurance, and granted to the lender sole

---

[10] Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 310, 119 S. Ct. 1961, 1964, 144 L. Ed. 2d 319, 326 (1999).
[11] Plaintiff's Memorandum in Support of Motion for Preliminary Injunction, Adv. Dkt. No. 8, pp. 4-5.

control over the proceeds, to either rebuild or repay the loan, at its option. This express language is what the court relied on in finding that it had the power to adjudicate the preliminary injunction.

Here, the Complaint seeks monetary damages for breach of the Management Agreement. No evidence was offered whereby the Plaintiff expressly required the Defendant to procure the insurance, or of any lien held by the Plaintiff in the Insurance Proceeds, or of Defendant's express agreement to purchase the insurance for the benefit of the Plaintiff. Nor are the Insurance Proceeds the subject of the Complaint. Therefore, Strouse Greenberg does not support the granting of a preliminary injunction.

## IV. Conclusion

For the reasons set forth in Grupo Mexicano, I find this Court lacks the authority to issue a preliminary injunction preventing the Defendant from disposing of the Insurance Proceeds – if and when they are disbursed to the Defendant from the Court's Registry - pending adjudication of the Plaintiff's contract claim for money damages.

Because I find this Court lacks the power to issue the preliminary injunction as requested by the Plaintiff, I need not consider whether the Plaintiff as met the elements for the granting of a preliminary injunction as set forth in

Fed.R.Civ.P. 65 (which is incorporated into bankruptcy proceedings by operation of Fed.R.Bankr.P. 7065).

For the reasons set forth above, the Court shall enter an Order denying Plaintiff's Motion for Preliminary Injunction.

Date: August 1, 2016   _____
Jeffery A. Deller
Chief U.S. Bankruptcy Judge

Cm:  Debtor, Counsel for the Debtor, Office of the United States Trustee, Counsel for the Defendant Park Restoration, LLC.

FILED
8/1/16 12:27 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA