**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | ) |
| | ) **Bankruptcy No. 14-11277-JAD** |
| **TRUSTEES OF CONNEAUT LAKE PARK, INC.,** | ) |
| | ) **Chapter 11**　　　　　FILED |
| | )　　　　　　　　　　12/15/17 4:26 pm |
| **Debtor.** | )　　　　　　　　　　CLERK |
| | X　　　　　　　　　　U.S. BANKRUPTCY |
| | )　　　　　　　　　　COURT - WDPA |
| **TRUSTEES OF CONNEAUT LAKE PARK, INC.,** | ) **Adversary No. 16-01029-JAD** |
| | ) |
| | ) **Related Doc. No. 1** |
| **Plaintiff,** | ) |
| | ) |
| **-v-** | ) |
| | ) |
| **PARK RESTORATION, LLC,** | ) |
| | ) |
| **Defendant.** | ) |
| | X |

## MEMORANDUM OPINION

Trustees of Conneaut Lake Park, Inc. ("Plaintiff" or "TCLP") commenced the above-captioned adversary proceeding by filing its three-count Complaint against Park Restoration, LLC ("Defendant" or "Park Restoration", and together with Trustees of Conneaut Lake Park, Inc., "the Parties"). See *Complaint*, ECF No. 1.

Pursuant to the *Complaint*, TCLP alleges two counts of breach of contract (Counts I and II) and one count of contractual indemnification (Count III) against Park Restoration stemming from the Parties' Beach Club Management Agreement. See *Complaint*, ECF No. 1.

The details of the Beach Club Management Agreement are discussed more in-depth in this Court's *Memorandum Opinion* dated February 21, 2017, which addressed the Parties' cross motions for judgment on the pleadings. See *Mem. Op.*, ECF No. 67.

In the *Memorandum Opinion* and corresponding orders, the Court: (1) entered judgment on the pleadings as to liability only in favor of TCLP with respect to Count I of the *Complaint*, (2) stayed prosecution of Counts II and III, (3) denied Park Restoration's *Cross Motion for Judgment on the Pleadings*, and (4) set trial on the issue of damages relative to Count I. See id.; *Order*, ECF No. 68; and *Scheduling Order Regarding Trial on Damages*, ECF No. 69.

A trial was held on the issue of damages with respect to Count I of the *Complaint* on May 17, 2017 and July 24, 2017. Thereafter, the Parties were provided with an opportunity to brief the issues which are now ripe for decision.[1]

## I.
## Procedural and Factual History

TCLP seeks recovery from Park Restoration in relation to the Beach Club Management Agreement. As stated above, the details of the Beach Club Management Agreement are more specifically set out in this Court's February

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§157 and 1334. The Plaintiff asserts that this Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. §157(b)(2)(O). However, garden variety breach of contract claims are not core proceedings. Astropower Liquidating Tr. v. Xantrex Tech., Inc. (In re Astropower Liquidating Tr.), 335 B.R. 309, 323 (Bankr. D. Del. 2005). Despite the non-core nature of this proceeding, the Parties have consented to this Court's ability to enter final judgment. See *Order of Ct. Approving Joint Disc. Plan and Statement of Estimated Time of Trial Dated July 25, 2016*, ECF No. 36; see also Wellness Int'l Network, LTD v. Sharif, _ U.S. _, 135 S. Ct. 1932, 191 L. Ed. 2d. 911 (2015), and Ardi Ltd. P'ship v. The Buncher Co. (In re River Entm't), 467 B.R. 808 (Bankr. W.D. Pa. 2012).

21st *Memorandum Opinion.* However, the details pertinent to resolution of the issue of damages as to Count I only, are as follows:

TCLP owns certain real property located on the lakefront of Conneaut Lake in Crawford County, Pennsylvania and upon which sat a structure referred to as the Beach Club (the "Property"). See *Mem. Op.* 2, ECF No. 67. The Property is subject to a charitable use restriction (the "Charitable Use Restriction") which states that the Property is to be held:

> IN TRUST, NEVERTHELESS, for the use of the general public forever subject, however, to such rules and regulations for the use of said land to be known as "Conneaut Lake Park" as may be made from time-to-time by the Trustees of Conneaut Lake Park, Inc., and their successors; AND FURTHER specifically, in part for use as a public amusement park and the like, and in part for use as a public park with open parkland and the like, and in part for the use for public buildings and the like forever; AND FURTHER in addition specifically in part for public access to and use of Conneaut Lake and the lake shore, for swimming and boating and the like, forever; AND FURTHER, for other like and similar and related public purposes; all forever.

See *Appraisal Report* ("TCLP's Appraisal") 27, ECF No. 103, Ex. P-11.

The Parties entered into the Beach Club Management Agreement on or about November 24, 2008, whereby Park Restoration agreed to provide operational and management services for the Beach Club. See *Mem. Op.* 3, ECF No. 67. The Beach Club Management Agreement stated that upon its termination, Park Restoration was duty bound to "vacate the premises ensuring that it is in broom clean condition without any damages to any equipment or property." Id. at 15.

On August 1, 2013, a fire completely destroyed the Beach Club. Thereafter, TCLP declared the Beach Club Management Agreement to be terminated at which time Park Restoration failed to return the Beach Club in "broom clean" condition free from damage. <u>See</u> *Complaint*, Ex. B, ECF No. 1; *Mem. Op.* 15, ECF No. 67.

After this bankruptcy was commenced, TCLP initiated this adversary proceeding alleging at Count I, a claim of breach of contract due to Park Restoration's failure to return the Beach Club to TCLP in "broom clean" condition free from damage. <u>See</u> *Mem. Op.*, ECF No. 67.

Following the close of pleadings, the Parties filed their respective cross-motions for judgment on the pleadings, which were adjudicated in TCLP's favor as to liability on Count I only, with prosecution of Counts II and III stayed pending resolution of the issue of damages on Count I.

Contemporaneously with the issuance of the February 21st *Memorandum Opinion*, the Court issued a scheduling order setting the trial on damages for May 17, 2017, and *inter alia*, fixed the deadline for completing discovery as April 14, 2017. <u>See</u> *Scheduling Order Regarding Trial on Damages*, ECF No. 69.

On May 3, 2017, the Parties submitted their *Meet & Confer Stipulation*, ECF No. 76, wherein it was disclosed to the Court for the first time that Park Restoration intended to present at the May 17th trial a pre-fire and post-fire appraisal ("Park's Appraisal") of the Property. The gist of this evidence was that Park Restoration claimed that the subject Property was worth more after the fire and that TCLP had no cognizable claim for damages. TCLP, however,

identified no appraisal evidence as part of its prepared witness list and exhibit list.

Park's Appraisal was identified in the section of the *Meet & Confer Stipulation* titled "Agreed, Marked Exhibits for Trial" and appraiser Vicki Gillette was listed as the associated witness. See ECF No. 76.

On May 5, 2017, Park Restoration filed a motion for summary judgment on the basis that the appropriate measure of damages for Count I was the diminution of fair market value of the Property occasioned by the fire, and since TCLP failed to identify in its pre-trial filings any appraisal or other evidence which would demonstrate a diminution, TCLP would be unable to sustain its burden at the May 17th trial. See *Def.'s Mot. to Lift Stay and for Summ. J.*, ECF No. 83. Due to the close proximity of the trial, the deadline to respond to the summary judgment motion was not set to expire until after the May 17th trial. Accordingly, as of the date of trial, no responsive pleading was yet filed by TCLP.

At the May 17th trial, TCLP proceeded on its legal argument that the appropriate measure of damages is repair and replacement costs of the Beach Club, and presented evidence that the replacement costs were $1,978,375 and $830,917, with the latter figure taking into account depreciation attributable to age and condition of the Beach Club. See *Plaintiff's Exhibit List*, Ex. P-4, Ex. B, ECF No. 77. These replacement costs were stipulated to by Park Restoration. See Id., *Tr. of Evidentiary Hr'g Regarding Damages* 7-9, ECF No. 117 ("May 17th Transcript).

At the trial, Park's Appraisal and the testimony of Vicki Gillette were offered into evidence by Park Restoration. TCLP's Counsel objected to the admissibility of Park's Appraisal, arguing that although Park's Appraisal was identified as an "Agreed, Marked Exhibit[ ] for Trial" in the *Meet & Confer Stipulation*, its inclusion was a courtesy.  Counsel also argued that TCLP did not intend to stipulate to the alleged facts set forth in Park's Appraisal, and in fact, Park's Appraisal was only provided to TCLP on May 3, 2017—nearly three weeks after the close of discovery. <u>See</u> May 17th Transcript 6-15, 73-77.

Perhaps now wavering in her confidence of TCLP's legal theory of damages, TCLP's Counsel requested a continuance of the trial in order to allow TCLP to obtain its own appraisal of the Property. Unsurprisingly, Park Restoration objected.

In weighing the unique circumstances of the case, the Court recognized that Park Restoration failed to adequately disclose its appraisal, but noted that the Parties included it in the *Meet & Confer Stipulation* and TCLP failed to file a motion in limine despite having two weeks to do so prior to trial. <u>See</u> <u>id.</u>

Nonetheless, in the interest of fairness and finding no prejudice to Park Restoration, the Court continued the trial to July 24, 2017, in order to allow TCLP to obtain an appraisal. <u>See</u> May 17th Transcript 75-79; *Scheduling Order Regarding Continued Trial on Damages*, ECF No. 90 ("Order Continuing Trial"). The Court also directed that the Parties be permitted to conduct additional limited discovery until July 7, 2017, with depositions concluding no later than July 14, 2017. <u>See</u> Order Continuing Trial 5.

In the interim between the May 17th and July 24th trial dates, TCLP filed a response to the summary judgment motion. On July 17, 2017, Park Restoration filed a *Motion to Compel Production, or in the Alternative, In Limine to Exclude Testimony* ("Motion to Compel").

Central to the Motion to Compel, Park Restoration complained of TCLP's failure to provide records upon which TCLP's expert appraiser, Robert Glowacki, formulated his pre-fire opinion of value of the Property. See Motion to Compel, ECF No. 102.  TCLP defended against the Motion to Compel by arguing that not only was the information confidential, but that it was irrelevant as TCLP agreed to stipulate to Park Restoration's pre-fire fair market value of $622,000. See *Resp. to Mot. to Compel Production,* ECF No. 106. Thus, the only question of value was the post-fire fair market value of the Property (and the extent to which it showed a diminution in fair market value occasioned by the fire damage).

Immediately prior to the continued trial on damages, a hearing was held on the Motion to Compel. The result of the hearing was that irrespective of TCLP's stipulation to pre-fire value, the documents underlying Glowacki's pre-fire valuation were ordered to be provided post-trial for confidential review. See *Tr. of Mot. to Compel or, In the Alternative, In Limine to Exclude Testimony*, ECF No. 120 ("July 24th Transcript").

At the continued trial on damages, TCLP then presented the testimony of Glowacki as well as his written appraisal of the Property. In rebuttal of Glowacki's testimony, Park Restoration re-called Gillette and sought to

introduce a prepared rebuttal appraisal. However, although Gillette was permitted to testify, the rebuttal appraisal was excluded on TCLP's objection as Park Restoration yet again failed to timely disclose it to TCLP.[2]

Following the close of testimony on July 24th, Park Restoration was provided time to review the previously undisclosed information subject of the Motion to Compel with the option of requesting further evidentiary proceedings related thereto. See *Consent Order Concerning Confidential Information*, ECF No. 109. No further proceedings were requested and the Parties were invited to file post-trial briefs. While TCLP inexplicably elected not to make such a submission, Park Restoration filed its post-trial brief on September 11, 2017.

## II.

Under Pennsylvania law, a party asserting a breach of contract claim must establish three elements: (1) the existence of a contract, (2) a breach of one or more of the duties imposed by the contract, and (3) damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Finding that the first two elements were satisfied, this Court entered judgment on the pleadings in favor of TCLP and against Park Restoration as to liability only on Count I. As such, the issue addressed by the Court herein is the extent to which damages exist as to Count I of TCLP's *Complaint*.

---

[2] The rebuttal appraisal was dated June 30, 2017, but was not provided to TCLP until July 18, 2017—just six days prior to the continued trial and well after the close of limited discovery. See July 24th Transcript 91-94.

**A.**
**Applicable Measure of Damages for Injury to Real Property**

Where injury to real property is permanent, repair and replacement costs are irrelevant. Arch Ins. Co. v. Carol & Dave's Roadhouse, Inc., 567 F. App'x 131, 134 (3d Cir. 2014) (quoting Babich v. Pittsburgh & New Eng. Trucking Co., 563 A.2d 168, 170 (Pa. Super. Ct. 1989)). It is established law in the Commonwealth of Pennsylvania, that the "general measure of damages for permanent harm to real property is the diminution in market value attributable to the conduct, product, or instrumentality giving rise to liability," but when injury is reparable, damages are calculated at "the lesser of the cost of repair or the market value of the affected property." Pa. Dept. of Gen. Servs. v. U.S. Mineral Prods. Co., 898 A.2d 590, 596 (Pa. 2006). See also Herring v. City of Jeannette, 47 A.3d 202, 204–205 (Pa. Commw. Ct. 2012), and Arch Ins. Co. v. Carol & Dave's Roadhouse, Inc., 567 F. App'x at 134–35. Thus, "while the measure of damages for harm to real property is different for permanent harm and reparable harm, in both situations, damages are limited by the [pre-injury] market value of the property." Herring v. City of Jeannette, 47 A.3d at 204–205.

The purpose of limiting such recovery is rooted in the general purpose of compensatory damages as a remedy. Pennsylvania courts have recognized that, "[t]he general principle upon which compensation for injuries to real property is given is that the plaintiff should be reimbursed to the extent of the injury to the property[,]" but that the plaintiff should not receive a windfall. Rabe v. Shoenberger Coal Co., 62 A. 855 (Pa. 1906) (citations omitted); see also

<u>Duquesne Light Co. v. Woodland Hills Sch. Dist.</u>, 700 A.2d 1038, 1053 (Pa. Commw. Ct. 1997). A windfall could occur where, as in this matter, the cost of repair would exceed the pre-injury market value of the real property. <u>See Duquesne Light Co. v. Woodland Hills Sch. Dist.</u>, 700 A.2d at 1053. In such instance, a land-owner, after being awarded the full cost to repair real property to its pre-injury state, could (instead of making repairs) sell the property and pocket the difference between the pre-injury market value and the cost of the repairs. <u>Id.</u> Thus, if this were to occur, the plaintiff would receive a windfall in excess of sums necessary to compensate it for its loss.

Further emphasizing the importance of avoiding a windfall recovery, the Commonwealth Court of Pennsylvania in <u>Duquesne Light Co.</u> found it appropriate to define "permanency" in the context of whether the repair costs (if repairs could be completed) would be "unfair or inappropriate under the circumstances." <u>Id.</u> at 1053.

> Where the cost of repair is shown to be reasonable, the injury to real property is not permanent and the cost of repair would be the appropriate measure of damages. However, where the cost of replacing the real property in its original condition disproportionately exceeds the diminution in the value of the property, the injury to real property is permanent and the cost of repair would not be fair or appropriate. Rather, the proper measure of damages for permanent injury would be the difference between the value of the property before and after the harm. Whether or not an injury to real property is "permanent" is an issue for the trier of fact.

<u>Duquesne Light Co. v. Woodland Hills Sch. Dist.</u>, 700 A.2d at 1053. <u>See also</u> <u>Vassell v. Travis</u>, No. 04-1313, 2007 WL 2571634, at *4-5 (E.D. Pa. Sept. 4, 2007) (citing <u>Duquesne Light Co.</u>).

10

In this matter, there is no dispute that the injury to the Property is permanent. In addition, the Parties have stipulated that the Beach Club structure was "totally destroyed" by fire on August 1, 2013. See *Meet & Confer Stipulation* 2, ECF No. 76. Moreover, as set forth more fully below, the credible evidence of record is that the cost of repair disproportionately exceeds the diminution in fair market value to the Property occasioned by the fire. Specifically, the stipulated cost of replacement or repair is $1,978,375 on the high end and $830,917 on the low end, and, as set forth below, TCLP has not produced any credible evidence that the fair market value of the Property was diminished as a result of the fire.

Accordingly, the applicable measure of damages is the diminution of fair market value attributable to the injury. See e.g. Arch Ins. Co. v. Carol & Dave's Roadhouse, Inc., 567 F. App'x at 135 (with respect to real property, "where the injury is characterized as permanent as when a building is completely destroyed, the measure of damages becomes the decrease in the fair market value of the property." (citation and internal brackets omitted)), Penn Nat'l Ins. v. HNI Corp., Nos. 1:05-CV-2096, 4:06-CV-0747, 2007 WL 2907542, at *3 (M.D. Pa. Oct. 3, 2007) (finding it "beyond peradventure" that the complete destruction of a residence by fire was "permanent and irreparable"), Babich v. Pittsburgh & New Eng. Trucking Co., 563 A.2d at 170 (where a building is destroyed the nature of damages is permanent and repair and replacement costs are irrelevant to the calculation of damages).

**B.**
**Damages for Injury to Real Property Under**
**Breach of Contract vs. Tort Claim**

TCLP disputes that diminution of fair market value is the appropriate measure of damages in this matter by reason that TCLP seeks recovery under a breach of contract theory as opposed to having asserted a tort claim. See May 17th Transcript 15-22; *Pl.'s Br. in Opp'n to Def.'s Mot. to Lift Stay and for Summ. J.* 5-6, ECF No. 95.

TCLP points out that the cases upon which Park Restoration relies in advancing its "diminution in fair market value" measure of damages are tort cases. TCLP assigns error to reliance on such cases as TCLP argues that in contrast to actions sounding in tort, the purpose of damages for breach of contract claims is to place the non-breaching party in the position it would have occupied if the contract had been performed. Id.

Accordingly, TCLP avers that the only appropriate measure of damages in this matter is repair and replacements costs, as that is the only remedy that will place TCLP in the same position it would have occupied if the Beach Club Management Agreement was performed – i.e. the same position as if the Beach Club was returned to TCLP in broom swept condition. Id. Park Restoration disagrees, averring that the measure of damages for breach of contract and tort claims would be all but the same. Interestingly, in advancing their diverging positions, the Parties cite not only the same case, City of Allentown v. O'Brien & Gere Engineers, Inc., No. CIV. A. 94-2384, 1997 WL 256050 (E.D. Pa. May 8,

1997), but the same paragraph within that case, with Park Restoration relying

on the earlier and TCLP relying on the later of the emphasized quotation below:

> **In a commercial context such as this, where a plaintiff has suffered economic loss resulting from an injury to its property, both the underlying purpose of a damage award and the measure of damages for tortious conduct and for breach of contract/warranty are substantively identical under Pennsylvania law.** Plaintiff is to be restored, insofar as possible, to the position it would have occupied if the negligent conduct had not occurred and/or if the contract had been properly performed to achieve the promised result. See, e.g., Commonwealth Department of Transportation v. Estate of Crea, 92 Pa.Cmwlth. 242, 483 A.2d 996, 1001 (Pa.Commwlth.1977), "The fundamental purpose of damages for an injury to or destruction of property by the tortious conduct of another is to compensate the injured party for the actual loss suffered;" Fort Washington Resources, Inc. v. Tannen, 901 F.Supp. 932, 943 (E.D.Pa.1995), **"Under Pennsylvania law, courts generally award damages to the non-breaching party so as to place it in the economic position it would have occupied had the contract been performed." Thus, plaintiff is entitled to recover an amount of damages that will restore the economic value of the property lost, measured by the cost of correcting the defects caused by defendant's conduct or by the cost of replacing the property**. Douglas v. Licciardi Construction Co., Inc., 386 Pa.Super. 292, 562 A.2d 913 (Pa.Super.1989). In addition, for breach of contract, plaintiff may recover incidental and consequential costs caused by the breach. Id.

City of Allentown, 1997 WL 256050, at *24 (emphasis added).

In City of Allentown, the City of Allentown contracted with the defendant,

an engineering firm, to design and install a water intake system for the purpose

of providing the City of Allentown with a supplemental source of drinking

water.  In selecting the design to be installed, the City of Allentown relied upon

the reports and recommendations of the engineering firm, which were later

shown to be unreliable.  After completion, the system never worked as intended

and after attempts to remedy the situation, the City of Allentown brought suit

against the engineering firm for breach of contract, breach of express warranty, breach of implied warranty, and negligence, in connection with the engineering firm's failure to adequately design and install a functioning water intake system. Id.

After finding for the City of Allentown on all counts, the court awarded the City of Allentown the costs for the attempted repairs to make the defective intake system work as promised, as well as the costs incurred in replacing the system. It is this award of the costs associated with the attempted repair and eventual replacement of the water intake system upon which TCLP relies in advancing its theory of recovery.  However, such reliance is misguided as the Court finds City of Allentown, which concerns a defendant's failure to design and install property—as opposed to compensation for injury to existing real property—uninformative to the matter at hand. As discussed at length above, the courts within the Commonwealth of Pennsylvania have articulated a specific measurement of damages for injury to existing real property which is neither invoked by the circumstances of the City of Allentown, nor distinguished by the opinion in its resolution of the issues therein.

TCLP cites no persuasive authority establishing that the measure of damages for injury to real property is different when evaluated in the context of breach of contract versus tort claims. Specifically, that diminution in fair market value is an inappropriate remedy in breach of contract actions. Indeed, there is case-law contrary to the position of TCLP.

14

In <u>Giordano v. Brandywine Mushroom Corp</u>., 32 Pa. D. & C.2d 522, 1963 WL 8448 (Pa. Com. Pl. 1963), the defendant-lessee contracted with the plaintiffs-lessors for the lease of a stone barn. As part of the lease agreement, defendant covenanted to "keep and maintain [the] barn in good condition[.]" <u>Id.</u> at 524. During the lease term, the barn sustained injury and the plaintiffs brought an action for damages. At trial, the plaintiffs presented testimony that at the time of the lease, the barn had a value of $7,500, but due to the damage the barn now had a value $5,000. Further, that it would cost $25,000 to put the barn in its original condition. <u>Id.</u> The trial judge instructed the jury that if they found the testimony to be credible, that damages would be limited to $2,500—the difference in fair market value—and the jury returned an award in that amount.  The plaintiffs moved for a new trial on the basis that the judge's charge as to amount of damages was errant. <u>Id.</u> Specifically, the plaintiffs argued that while the decrease in fair market value was the appropriate measure of damages for an action in tort, that cost of repair was the correct measure of damages for the defendant's breach of the covenant to repair. The court rejected this argument, noting that in that case, as in the case *sub judice*, an award of repair costs would exceed the pre-injury value of the building itself. <u>Id.</u> at 525. Thus, the plaintiffs would receive a windfall recovery. Citing to the proposition set forth in the Restatement of Contracts that compensatory damages are meant to put the injured party in as good as a position as it would have been had the contract been fully performed, the court stated that had the defendant performed its covenant:

> . . . plaintiffs would have had a barn worth $7,500 at the time this
> suit was started. They would not have had a stone barn worth but
> $5,000, plus upwards of $25,000 in cash, as plaintiffs contend. In
> order to put plaintiffs in the position in which they would have
> been had the covenant been performed, it then becomes necessary
> to award to them the difference in value between that which they
> would have had had there been performance and that which they
> now have without it.

Giordano v. Brandywine Mushroom Corp., 32 Pa. D. & C.2d at 525.

Accordingly, the court found that it was not an error to limit damages to the

diminution in fair market value of the barn.

This holding is in line with Duquesne Light Co.'s direction, discussed

above, that "[i]n keeping with the purpose of compensatory damages and in

prevention of windfall awards," where repair and replacement costs

disproportionately exceed the decrease in fair market value of injured real

property, the injury will be considered permanent and damages will be

assessed at the difference in fair market value pre- and post-injury. Duquesne

Light Co. v. Woodland Hills Sch. Dist., 700 A.2d at 1053.  In such instance, an

award of repair costs would be neither "fair [n]or appropriate." Id.

More recent case-law also suggests, while not addressing the tort versus

breach of contract issue directly, that no distinction in the calculation of

damages for injury to real property exists by applying the "diminution of fair

market value" standard in a breach of contract case. In Penn National

Insurance v. HNI Corp., a subrogee insurer brought breach of contract and

negligence claims against an installer of a fireplace related to the complete fire

destruction of a home. The insurer's breach of contract claims were resolved in

its favor, but determination of damages was reserved for a later date. In

16

assessing the damages, the United States District Court for the Middle District of Pennsylvania cited to the general standards of calculating damages for injury to real property iterated in the Supreme Court of Pennsylvania's holding in <u>Pa. Department of General Services v. U.S. Mineral Products Co.</u> In short, that the measure of damages for permanent injury to real property is the diminution in market value, but where the injury can be repaired (and is thus, temporary), damages are the lesser of the cost of repair or the market value of the affected property. <u>Penn Nat'l Ins. v. HNI Corp.</u>, 2007 WL 2907542, at *2-3.

Outside of the Commonwealth of Pennsylvania, at least one court has squarely addressed the issue of whether damages for injury to real property are calculated differently in breach of contract versus tort actions. In <u>Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.</u>, 449 S.W.3d 474 (Tex. 2014), the Supreme Court of Texas was asked to determine whether damages for injury to real property were calculated differently when the theory of recovery was breach of contract versus tort. Similar to the Commonwealth of Pennsylvania, the general measure of damages in the State of Texas for permanent injury to real property is the diminution of fair market value, whereas damages for temporary injury is the cost of repair, unless the cost of repair significantly exceeds the decrease in diminution of fair market value, then such decrease is the appropriate amount of damages. <u>See generally, id.</u> In <u>Gilbert Wheeler, Inc.</u>, plaintiff sued for injury to real property when the defendant impermissibly altered the terrain and removed vast swaths of trees from the plaintiff's real property in breach of the parties' contract.

Acknowledging that the injury resulted in little to no diminution of fair market value of the real property, the plaintiff alleged that the question of whether the injury was temporary (i.e. reparable) or permanent was irrelevant in the context of a breach of contract action. Id.  Specifically, the plaintiff argued that since damages for breach of contract actions intend to give the plaintiff the benefit of the bargain and place the plaintiff in the position it would have occupied if the contract had been performed, restoration damages were appropriate regardless of whether the injury was permanent or temporary. Id. at 479.   This is an argument identical to the one advanced by TCLP.

The Supreme Court of Texas in Gilbert Wheeler rejected the plaintiff's position, finding that the temporary versus permanent distinction was applicable to breach of contract cases, reasoning that: "We see no reason to compensate a party differently because the wrongful conduct that caused the identical injury stems from breaching a contract rather than committing a tort." Id. at 479. Adding, that exceptions to the application of the general rule "operate to ensure land-owners are adequately compensated[,]" but no windfall is awarded. Id. at 479-481.

Given the prior holdings in Giordano and Penn National Insurance, and considering the similar structure and intent of damages—that the injured party be compensated for its loss but not receive a windfall—the Court finds Gilbert Wheeler persuasive and agrees that for purposes of measuring damages resultant from injury to real property, the "permanent" versus "temporary" analysis applies regardless of whether the underlying action sounds in tort or

breach of contract. Accordingly, the Court rejects TCLP's argument that repair and replacement costs are the only appropriate measure of damages herein. The Court will apply the general measure of damages for injury to real property as set out in Pa. Department of General Services.  That is, this Court will follow the so-called "before and after rule" and finds that the appropriate measure of damages is the diminution in the fair market value of the Property caused by Park Restoration's failure to return the premises in broom clean condition.[3]

For purposes of completeness, the Court notes that in the *Plaintiff's Brief in Opposition to Defendant's Motion to Lift Stay and for Summary Judgment*, ECF No. 95, TCLP postulates, without citation to authority, that if the change in fair market value is found to be the appropriate standard for an award of damages, the value of the underlying real property upon which the Beach Club sat is irrelevant. Instead, TCLP argues that the diminution in value of the Beach Club structure itself—without regard to the underlying land—should be the measure of damages and that such change in value should be measured solely by the loss of income and profits to TCLP. See id. at 6. The Court rejects this argument.

---

[3] As an exception to the general rule of awarding the diminution in fair market value of real property in instances of irreparable harm, Pennsylvania courts have recognized that where the harmed property is subject to a special use or purpose which would render it unable to be valued in the commercial sense (i.e. a fair market value cannot be ascertained), the appropriate amount of damages to be awarded is the replacement costs accounting for pre-destruction depreciation. See Pa. Dept. of Gen. Servs., 898 A.2d at 596-600; see also Herring v. City of Jeannette, 47 A.3d at 205. However, neither party advanced this theory of recovery. To the contrary, both parties contended that the Property has an ascertainable market value and is capable of being appraised.

Under Pennsylvania law, in measuring the diminution in value of injured real property, the fair market value of real property is measured as a whole even where permanent injury is sustained by only a portion thereof. See e.g. Rabe v. Shoenberger Coal Co., 62 A. 854 (Pa. 1906) (where real property upon which a farm operated suffered, *inter alia*, the loss of five of its twelve springs due to injury caused by a coal company's operations, damages would be measured by the diminution in value of the real property as a whole and not by the independent value of the springs lost). Moreover, loss of income from an income-producing structure should be reflected in the fair market value of the property as a whole. See Vassell, 2007 WL 2571634, at *3-4.

In Vassell v. Travis, the plaintiffs owned a restored "historic" farmhouse which they used as a rental property. During a rental period, the defendants (who were not the tenants) injured the farmhouse when a vehicle operated by one of the defendants collided with the farmhouse. Citing the "historic" nature of the farmhouse, the plaintiffs averred that an exception to the general rule of real property damages applied as the market value for the property could not be ascertained (see footnote 3, *infra*). Thus, the plaintiffs sought cost of repair damages irrespective of whether the injury was permanent or reparable, and without consideration of the value of the property as a whole. Vassell, 2007 WL 2571634, at *3. The defendants countered that the property should be valued as a whole, and not the farmhouse individually. Id. at *3 n.4. Commenting on the defendants' position, the court in Vassell observed that:

. . . the question of valuation of the [farm]house as distinct from the property essentially begs the question of whether there is anything special about the [farm]house to warrant application of a cost-of-repair theory of damages (which necessarily distinguishes the entity to be repaired from the real estate on which it is situated).

Id. Finding that the property (inclusive of the farmhouse) did have an ascertainable market value, the court determined that the "cost of repair" exception did not apply. Id. at *4. Further observing that:

While the market value of the property as a whole may not reflect the value of or expenditures attendant to the [plaintiffs'] restoration efforts, it does reflect the value of the [farm]house as restored, including income earned from the [farm]house in the form of rent receipts. Likewise, the diminution in the value of the property as a result of the [farm]house's destruction should reflect the loss of any value attributable to the [farm]house. The [plaintiffs] have not presented any evidence thus far to justify finding some additional value of the [farm]house independent of the property on which it is situated that would not be reflected in the market value (e.g., if the market does not value "historic" houses). Therefore, the Court concludes that the standard rule governing the appropriate measure of damages applies.

Vassell, 2007 WL 2571634, at *4 (italics omitted).

Accordingly, absent a showing that the exception applies, not only is an injured structure to be valued inclusive of the underlying lot, but the income generated by the structure—and the loss thereof—should also be reflected in its overall fair market value.[4]

---

[4] Further, to the extent that TCLP seeks loss of income or profits independent of the overall diminution in fair market value of the Property as a whole, the Court finds that TCLP has failed to show loss of income or profits with reasonably certainty and thus, is not entitled to such recovery. See e.g. Brisbin v. Superior Valve Co., 398 F.3d 279, 289 (3d Cir. 2005) (lost profits may be recovered if there is evidence to establish damages with reasonable certainty). In support of its claim for loss of income or profits, TCLP points to the income figures utilized by Park Restoration's appraiser in calculating the pre-fire fair market value of the Property. See Plaintiff's Brief in Opposition to Defendant's Motion to Lift Stay and for Summary Judgment 6-7,

Consequently, this Court concludes that the measure of damages in this matter is the diminution in the fair market value of the Property caused by the Defendant's breach of the Beach Club Management Agreement. The remaining question then is whether TCLP has sustained its burden of proof. The record reflects that it did not.

### III.
### A.
### Standard for Establishing Damages

Under Pennsylvania law, in order for a party to succeed on a breach of contract claim, the party must, *inter alia*, establish damages with "reasonable certainty" as opposed to "mathematical certainty." ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659 (3d Cir. 1998); see also Ware v. Rodale Press, Inc., 322 F.3d at 226 ("To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a "reasonable certainty.")"; Penn Nat'l Ins. v. HNI Corp., 2007 WL 2907542, at *4 (the party claiming damages has the burden of proving damages by a preponderance of

---

ECF No. 95. However, those figures represent the percentage of gross profits (less certain taxes) payable to TCLP as a direct result of Park Restoration's operation and management of the Property under the Beach Club Management Agreement. See Park's Appraisal 33. As raised by Park Restoration at the May 17th hearing in response to TCLP's claim for loss of income, the Parties have stipulated that the Beach Club Management Agreement terminated prior to the action constituting the breach—i.e. the failure to return the Beach Club in broom clean condition. See May 17th Transcript 74-75. As such, no further income was payable to TCLP by Park Restoration at the time of breach. TCLP has failed to aver, let alone show, that it is reasonably certain that going forward TCLP would have earned the same or similar levels of income or profits independent of Park Restoration's management and operation of the Property, but for the breach. Accordingly, TCLP has failed to establish lost income or profits with reasonable certainty. Further complicating TCLP's claim for loss of income or profits, as discussed *infra*, the cash flow projections attached to TCLP's disclosure statement **reflect an increase in income** attributable to the leasing of the Beach Club Pad, thereby undermining any loss of income or profits claim.

the evidence, to a reasonable degree of certainty).  In order to show damages to

a "reasonable certainty," a plaintiff must establish a causal connection between

the breach and the loss. <u>Bd. of Trs., Roofers Local No. 30 Combined Welfare

Fund v. Int'l Fidelity Ins. Co.</u>, 63 F.Supp.3d 459, 471 (E.D. Pa. 2014) (citations

omitted).

In <u>ATACs Corp. v. Trans World Communications, Inc.</u>, the Third Circuit

Court of Appeals, acknowledging the difficulty in defining "reasonable

certainty," set forth the standard by which "reasonable certainty" is measured

under Pennsylvania law:

> Although mathematical certainty is not typically required, the general rule in Pennsylvania, as in most jurisdictions, is that if damages are difficult to establish, an injured party need only prove damages with reasonable certainty. <u>See</u> <u>Scobell, Inc. v. Schade</u>, 455 Pa.Super. 414, 688 A.2d 715, 719 (1997); <u>Sobers v. Shannon Optical Co.</u>, 326 Pa.Super. 170, 473 A.2d 1035, 1039 (1984); <u>see also</u> Restatement, supra, § 352; 5 Arthur L. Corbin, supra, §§ 1020, 1022. Doubts are construed against the breaching party. <u>See</u> <u>Delahanty v. First Pennsylvania Bank</u>, 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983); Restatement, supra, § 342 cmt. a.

> "Reasonable certainty," as with most other standards of proof, is a difficult concept to quantify, but Pennsylvania courts have provided guidance as to what the term entails for purposes of assessing damages. At a minimum, reasonable certainty embraces a rough calculation that is not "too speculative, vague or contingent" upon some unknown factor. <u>See</u> <u>Spang & Co. v. United States Steel Corp.</u>, 519 Pa. 14, 545 A.2d 861, 866 (1988). Conversely, applying the reasonable certainty standard does not preclude an award of damages because of "some uncertainty as to the precise amount of damages incurred." <u>Pugh v. Holmes</u>, 486 Pa. 272, 405 A.2d 897, 909 (1979). Pennsylvania jurisprudence governing the issue is summarized in <u>Aiken Indus., Inc. v. Estate of Wilson</u>, 477 Pa. 34, 383 A.2d 808 (1978), where the Pennsylvania Supreme Court ultimately concluded "that compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced, for there is judicial recognition of the difficulty or even impossibility of

the production of such proof. What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages." Id. 383 A.2d at 812.

155 F.3d at 669–70; see also Ware v. Rodale Press, Inc., 322 F.3d at 226; Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Service Co., 120 F.Supp.3d 449, 461 (W.D. Pa. 2015) (citing Ware and ATACS).

The Superior Court of Pennsylvania, in Printed Image of N.Y., Inc. v. Mifflin Press, LTD, further noted that: "[t]he question of whether damages are speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages." 133 A.3d 55, 60 (Pa. Super. Ct. 2016); see also Bd. of Trs., Roofers Local No. 30 Combined Welfare Fund v. Int'l Fidelity Ins. Co., 63 F.Supp.3d at 471 ("Whether damages are remote or speculative rests not on the difficulty of calculating the amount, but on the question of whether damages are identifiable."(citations omitted)), and AMCO Ins. Co. v. Emery & Assocs., Inc., 926 F.Supp.2d 634, 647 (W.D. Pa. 2013) (in the context of damages for a negligence claim, "[t]he test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but instead asks the more basic question of whether there are identifiable damages. Damages are speculative only if the uncertainty concerns the fact of damages rather than the amount. (citations omitted)).

In the within matter, although it is uncontested that the Beach Club structure was destroyed, there is no consensus as to whether TCLP incurred any resultant damages. Accordingly, TCLP has the burden of proving by a

24

preponderance of the evidence (1) the existence of damages—that damages are not too remote or speculative, and (2) if such damages exist, that there is a "reasonably fair basis" for calculation. See James Corp. v. N. Allegheny Sch. Dist., 938 A.2d 474, 494-495 (Pa. Commw. Ct. 2007); see also Penn Nat'l Ins. v. HNI Corp., 2007 WL 2907542, at *4 (discussing the determination of damages incurred relative to the complete fire-destruction of a newly-constructed residence). "The duty of assessing damages is within the province of the fact-finder[.]" James Corp. v. N. Allegheny Sch. Dist., 938 A.2d at 497.

Again, as stated above, the measure of damages for a permanently harmed property is the difference between pre- and post-harm fair market value. Where the harm causes the property to appreciate in value, there are no damages. See Kenney v. Philadelphia, 21 Phila. 254, 1990 Phila. Cty. Rptr. LEXIS 60, 1990 WL 902451 (Pa. C.P. Sept. 12, 1990) ("The plaintiff, however, suffered no damage because the property's value appreciated.") Sub judice, the Parties stipulate that the pre-fire fair market value of the Property was $622,000. Accordingly, TCLP must demonstrate (1) with reasonably certainty that the post-fire fair market value of the Property fell below $622,000, and (2) if that can be shown, that there is a "reasonably fair basis" for calculation of damages.

## B.
### Appraisal of Post-Fire FMV of the Property

TCLP contends that the post-fire fair market value of the Property is $35,000, whereas Park Restoration avers that the complete destruction of the Beach Club caused the Property to appreciate in value to $670,000. In support

of their respective positions, the Parties introduced into evidence appraisals and expert witness testimony of the appraisers who authored such reports.

### i.    TCLP's Appraisal & Testimony of Robert E. Glowacki

At trial, TCLP presented the testimony of Robert E. Glowacki, a Certified General Appraiser, to support the post-fire fair market valuation of $35,000.

Glowacki's valuation of the Property was heavily influenced by the existence of the Charitable Use Restriction which affected his valuation by way of determination of the Property's size and the prospective use of the Property. In both his appraisal and testimony, Glowacki stated that the existence of the Charitable Use Restriction limited the potential development of the Property only to commercial ventures. See TCLP's Appraisal 42. As such, Glowacki only selected commercial sales for use as comparables in determining the Property's post-fire fair market value since, in his opinion, use of residential sales would be inappropriate under the circumstances.

At trial, Glowacki testified that in contrast to residential home sales abutting Conneaut Lake, which would be appraised by measuring the linear lakefront footage, for commercial sales the market has indicated that value is determined on a per square foot or per acre basis.  Accordingly, the designation of the Property as being suitable only for commercial development not only affected the comparable properties to be utilized, but also the unit of measurement on which value is calculated. With respect to size of the Property, the Court notes that no survey of the Property was presented in connection with this litigation. Moreover, the size of the Property was a point of

disagreement between the appraisers.  For his part, Glowacki determined that due to the existence of the Charitable Use Restriction, the size of the Property was limited to the footprint of the prior Beach Club structure itself; approximately 17,924 square feet. See TCLP's Appraisal 40. Having determined the size of the Property, Glowacki utilitzed what he believed to be comparable sales to assign a value on a per acre basis.

In performing his sales comparison analysis, Glowacki selected eight sales for comparison ranging in age from approximately sixteen years prior to four years following the appraisal's effective date of August 1, 2013. See TCLP's Appraisal 38-39. After making adjustments to the sale prices of the comparables on the basis of, *inter alia*, age of sale, conditions of sale, site area, location, inclusion in flood plain, and utilities, Glowacki opined that the applicable per acre price fell between $52,138 and $229,765. See TCLP's Appraisal at 38-39. Observing that one sale in particular skewed the per acre sales price upwards, Glowacki ultimately found that the value per acre was $85,000. See TCLP's Appraisal 43. Thus, given the Property's alleged .41 acre size, Glowacki determined that the Property's fair market value is $35,000. See TCLP's Appraisal 43.

### ii.    **Park's Appraisal & Testimony of Vicki Gillette**

In support of its valuation, Park Restoration presented the testimony of Vicki Gillette, who is also a Certified General Appraiser. Distinct from Glowacki's determination, Gillette concluded that post-fire, the highest and best use of the Property was either commercial or residential development

which would conform with applicable zoning requirements. <u>See</u> Park's Appraisal 21. In forming this assessment, Gillette testified at trial that she did not take into consideration the Charitable Use Restriction when rendering her appraisal and that the fair market value was calculated as if the Property could be conveyed without such restriction. This assertion is reflected in the appraisal itself, which states that, "the [P]roperty is appraised free and clear of any or all liens or encumbrances unless otherwise stated." <u>See</u> Park's Appraisal 6. Indeed, at the May 17th trial, Gillette testified that although she was aware of the Charitable Use Restriction, she was not familiar with its details. Nonetheless, Gillette still determined that residential use would be permitted. At the July 24th trial, Gillette affirmed her position, testifying that based on this Court's prior orders approving the sale of neighboring properties free and clear of the Charitable Use Restriction, the Charitable Use Restriction could likewise be lifted as to the Property.

In contrast to Glowacki, Gillette testified that the appropriate unit of measurement for valuation for properties abutting Conneaut Lake is per linear foot of lake frontage. Gillette estimated that the subject Property measured approximately 222 feet long (road/beach frontage) by 198 feet deep, totaling approximately one acre. <u>See</u> Park's Appraisal 11. Notable to her valuation, Gillette estimated that the Property possesses 222 feet of linear lake frontage on the basis that the Beach Club structure was 190 feet long, had 12 feet of decking, and was subject to a 20 foot sideline setback. <u>See</u> Park's Appraisal

11. Unlike Glowacki, Gillette did not limit the size of the Property to the footprint of the Beach Club structure.

In calculating her post-fire valuation of the Property, Gillette utilized the sales comparison approach. Having concluded that the Property was suitable for residential development, Gillette used as comparable properties three recent sales of vacant residential lots located adjacent (but for an intervening road) to the Property, which were similar in topography and view of the lake (the "Flynn Lots").

In comparing the Flynn Lots to the Property, Gillette calculated that the price per foot of lake frontage for the Flynn Lots ranged from $2,965 to $3,291. Adjusting the sale prices of the Flynn Lots to account for the larger frontage of the Property, Gillette determined that the adjusted market value of the Flynn Lots, if comparable in linear lake frontage, was between $663,000 and $683,000. <u>See</u> Park's Appraisal 30.  Gillette testified that after reviewing these comparables, she assigned the Property a per linear foot of lake frontage value of just over $3,000, giving the Property a post-fire fair market value of $670,000.[5]

### iii.   <u>Analysis of Appraisals</u>

In this matter, both Glowacki and Gillette utilized the sales comparison method. The sales comparison method is one of the three[6] recognized

---

[5] $670,000.00/222 ft. = $3,018.02 per foot.

[6] At trial, Glowacki testified that there appears to be a fourth method of valuation emerging which in short, requires the appraiser to walk across the street, look at the property, and ask himself/herself what the property is actually worth. The Court is not aware of any reputable appraisal methodology accepting this fourth alleged manor of valuing real estate.

approaches to real property valuation. However, while they used the same methodology, Glowacki and Gillette arrived at two very different values.

At the heart of this disparity is the extent to which each appraiser believed that the Charitable Use Restriction affected the potential market for the Property. This, in turn, caused each appraiser to select a different type of property for comparison.

Glowacki, who avers that the Charitable Use Restriction limits development to commercial use, utilized only commercial sale comparisons and ignored recent residential sales.

Conversely, Gillette opined that both commercial and residential use would be permitted, and utilized recent sales of residential lots as comparables. It is noteworthy that TCLP did not present any evidence as to the value of the Property if it were determined that residential development would be permitted, but Glowacki conceded at trial that if the Charitable Use Restriction was lifted the Flynn Lots would be good comparable sales. Thus, in order to sustain its burden of proving damages, TCLP must show that not only is its evidence of post-fire commercial fair market value credible, but that the use of the Property is, in fact, limited to commercial ventures by the Charitable Use Restriction. Otherwise, the undisputed or uncontroverted residential valuation places the fair market value of the Property above its pre-fire value of $622,000.

### iv.    **Credibility of TCLP's Appraisal**

The appraisal of real property is an inexact science and perhaps nowhere is this more evident than in a case such as this where two expert appraisers

utilize the same method of valuation and arrive at widely disparate values. See
In re Prussia Assocs., 322 B.R. 572, 583 (Bankr. E.D. Pa. 2005) (recognizing
that the appraisal of real estate is an "inexact science").

In assessing the evidence presented, "[t]he weight to be given to expert
testimony on valuation of land is for the trier of fact. It is within the province of
the trier of fact to weigh the credibility of valuation witnesses' testimony and
determine the fair value of the land." Mellon Bank (E.) Nat'l Ass'n v. Pa. Rest. of
A.B.E., Inc., 528 A.2d 654, 655 (Pa. Super. Ct. 1987) (citations omitted)
(finding no fault with the trial court's acceptance of a three-year old appraisal
over a more recent competing appraisal where the older appraisal utilized what
the trial court adjudged to be a better comparable and was viewed as being
completed at "arm's length").

This Court, sitting without a jury, is "free to believe all, part, or none of
the evidence that is presented, to make all credibility determinations, and to
resolve any conflicts in the evidence." Hodges v. Rodriguez, 645 A.2d 1340,
1343 (Pa. Super. Ct. 1994); see also Matakitis v. Woodmansee, 667 A.2d 228,
233 (Pa. Super. Ct. 1995) (affirming trial court's award of $300 for removal of
trees where plaintiff's expert's testimony of a $30,000 diminution in fair market
value was "neither credible nor realistic").

In this matter, TCLP bears the burden of proving damages. As such, the
Court will first examine whether TCLP has presented credible evidence in
support of its claim.  Upon review of the evidence presented, the Court finds
serious issues with the comparables selected by and relied upon by Glowacki

in formulating his appraisal of the Property. Specifically, the lack of commonality between the "comparable" properties and the Property with respect to age of sale, location, and other physical attributes undermines Glowacki's opinion. Accordingly, the Court finds that TCLP's Appraisal and Glowacki's testimony lack credibility and the Court assigns no weight to such evidence.

Specifically, the age of the comparables selected by Glowacki for inclusion in his appraisal is troubling. Of the eight total comparable sales identified by Glowacki, five sales and a portion of a sixth (which was a compilation of sales between 2001 and 2008), were at least ten years old. Of the remaining sales, one was six years old and the other occurred four years after the effective date. To compensate for the age of the sales, Glowacki adjusted the sales price of each sale by one-percent per year. See TCLP's Appraisal 38-39. Glowacki testified that this one-percent adjustment was more than enough to off-set the ages of the sales as the total rate of property value appreciation in Crawford County over a twenty-year period was 10.4%—roughly one-half percent per year. As such, a yearly appreciation of one-percent allegedly over-estimated the actual increase in value.[7]

---

[7] Notably, while Glowacki averred that the total Crawford County yearly property appreciation rate was roughly .5% and that use of 1% yearly upward adjustments was an over-estimation, Glowacki adjusted the price of the sale occurring four years after the effective date (identified in TCLP's Appraisal as Sale 7 (the "Low-Rise Asst Living")) downward 4%—representing nearly double his averred actual increase in value. While this error appears to be immaterial to Glowacki's overall calculation of fair market value, it does bear on the credibility of TCLP's Appraisal itself.

Gillette disagreed with Glowacki's contention, credibly testifying that lakefront property appreciated at a significantly greater rate than non-lakefront property. Thus suggesting that Glowacki's use of the county-wide appreciation rate was errant. Moreover, Gillette indicated that the age of some of the sales, specifically Sales 1 and 2 (respectively referred to as "the Salvation Army Property" and "the Wald Coleman Funeral Home"), in itself warranted exclusion. The Court agrees with Gillette's criticisms and, despite Glowacki's attempts to offset the age of the comparables, finds that the age of the comparable sales weigh against a finding that TCLP's Appraisal is credible.

In addition to the age of the comparables, Gillette criticized Glowacki's selection of comparable property sales on the basis that none of the properties were located lakefront to Conneaut Lake; which again, Gillette indicated was the most improved market in the area. The Court finds merit with Gillette's criticism and what's more, is further concerned by Glowacki's failure to adjust the comparable sales prices upwards to compensate for their non-lakefront locations.   See TCLP's Appraisal 38-39. In fact, to the contrary, Glowacki adjusted the sale price of two comparable properties, the Salvation Army Property and the Low-Rise Asst Living, downward by thirty percent to account for their "Superior/Corner" locations, see TCLP's Appraisal 38-39, thereby suggesting that their non-lakefront locations were more desirable. In his testimony, Glowacki conceded that he did not take into consideration the value of the lakefront location or view. He further opined, albeit unconvincingly, that the Beach Club, despite being physically located on Conneaut Lake's beach,

did not actually have lake frontage due to the public's right to access the area of the beach between the former Beach Club structure and the water's edge. Of course, the documentary evidence proves otherwise. That is, the Beach Club property does have a water view and was near the water's edge. The Court is perplexed by Glowacki's logic as well as his failure to assign any value to the Property's proximity to and/or view of Conneaut Lake. Glowacki himself acknowledged in his appraisal that the area in which the Property is located is a "Resort Commercial District" and that, as of Crawford County's lakes generally, Conneaut Lake is a "revenue source for the growing summer tourism industry." See TCLP's Appraisal 5, 8. Further, that "[t]he Conneaut Lake area should continue to be an attraction for recreational purposes though the operation of Conneaut Lake Park on a long-term basis is questionable." See TCLP's Appraisal 6. As Conneaut Lake is a significant, if not the most significant, recreational attraction in the recreational area, it defies logic that the Property's close proximity to Conneaut Lake would not positively affect the value of the Property.

Even disregarding the non-lakefront location of all of Glowacki's comparable properties, Glowacki's selection of comparables is further called into question by his inclusion of properties which otherwise appear to share little to no commonalities with the Property. For example, despite the Property being located in Crawford County, Pennsylvania, two comparables, identified in TCLP's Appraisal as Sale 5 ("Dollar General I") and Sale 6 ("Dollar General II"), are located in Erie County, Pennsylvania; an entirely different market, which

itself warrants exclusion of those sales as comparable. See TCLP's Appraisal 38-39.   Regardless, no reconciliation was made for the different locations. A third property, identified in TCLP's Appraisal as Sale 4 ("Lumber Store II"), lacks any road frontage at all. Although Glowacki attempted to off-set the lack of road access to Lumber Store II by an increase in sales price of 100 percent, the properties are too different for Lumber Store II to be considered a usable comparable.

Due to these issues, the Court finds that TCLP's Appraisal is unpersuasive and unreliable.  As stated above, TCLP bears the burden of proof in this breach of contract matter to establish damages by a preponderance of the evidence, to a reasonable degree of certainty.  As this Court does not find convincing the only evidence TCLP presented to establish the post-fire fair market value of the Property, the Court could only speculate as to the existence of damages. Stated another way, TCLP has presented the Court with no credible evidence on which it could conclude without speculation that the post-fire fair market value of the Property is less than $622,000. Accordingly, TCLP has failed to sustain its burden.

Although this result may appear harsh under the circumstances—in that, it is apparent that TCLP was injured (but not necessarily damaged) by the loss of the Beach Club—such denial of relief in the absence of credible evidence of fair market value is not unprecedented.

In Arch Insurance Co. v. Carol & Dave's Roadhouse, Inc., an insurance company, as subrogee, sought damages from a caterer for the total destruction

of real property (a fire hall) by fire on the theory that caterer's employees
caused the fire. On pre-trial motion, the court determined that damages for
injury to real property would be measured by the diminution in fair market
value, but the insurance company thereafter failed to introduce any credible
evidence as to the fair market value of the real property. Despite the
destruction of the real property, the court granted partial summary judgment
to the caterer. After trial, the jury found the caterer to be 55% negligent and
awarded the insurance company damages only in the amounts of personal
property and extra expenses (but not for damages to the building). On appeal,
the Third Circuit affirmed the rulings of the lower courts, noting that:

> The FMV was the appropriate measure of damages for the building
> destroyed in the fire. Due to its litigation decisions, Arch failed to
> produce any admissible or competent evidence to establish a
> market value for the building. Without the necessary evidence, the
> District Court acted appropriately in granting partial summary
> judgment in favor of Carol & Dave's. For these reasons, we will
> affirm.

Arch Ins. Co. v. Carol & Dave's Roadhouse, Inc., 567 F. App'x at 135.

It is significant that TCLP was afforded not one, but two opportunities to
put forth credible evidence as to the fair market value of the Property. First, at
the May 17, 2017 hearing, where TCLP was unprepared to present any
evidence as to fair market value, and again at the July 24, 2017 hearing, where
it presented evidence that this Court now finds lacks credibility.

Further, the Court takes note that according to TCLP's prior filings with
the Court, TCLP projects an increase in revenue associated with the Property,
despite the destruction of the Beach Club structure itself. According to

Gillette's pre-fire income capitalization calculation, the stabilized income to TCLP under the Beach Club Management Agreement was $43,425 per year prior to real estate taxes. <u>See</u> Park's Appraisal 33. TCLP agrees with this figure. <u>See</u> May 17th Transcript 51. However, pursuant to the cash flow projections attached to TCLP's Disclosure Statement, TCLP projects income of $5,000 per month from the "Land Lease"—"Beach Club Pad Lease," for a total income associated with the Property of $50,000 in 2018, and $60,000 in each 2019 and 2020. <u>See</u> *Disclosure Statement to Accompany Joint Plan Dated July 28, 2016* ("Disclosure Statement") Ex. I, pp. 11-13, 14-11277-JAD, ECF No. 426. Thus suggesting that the Property is, in fact, more valuable to TCLP post-fire as a vacant lot. TCLP's averments that the Property is worth only $35,000, despite projections of yearly income greater than that amount, beg the question of which is errant: TCLP's Appraisal or its cash flow projections.

Finally, the Court notes that its finding that TCLP failed to sustain its burden as to Count I does not foreclose TCLP from obtaining redress—TCLP has two remaining counts that it may pursue.

**C.**
**<u>Lifting of the Charitable Use Restriction</u>**

Even if TCLP's Appraisal was found to be a credible valuation of the Property when limited to commercial development, a significant issue remains as to whether the Property could be utilized for residential development.

The heart of TCLP's contention that the Property could only be used for commercial purposes is the Charitable Use Restriction imposed on the Property. Park Restoration refutes this assertion and presented the testimony

of Gillette who stated that a residential use would be permitted.  At the July

24th trial, Gillette opined that residential development of the Property would be

allowed under the Charitable Use Restriction, reasoning that even if a private

residence was constructed, it can be developed in a way that the public would

still have access to the beach and lake. Gillette further opined that the

Charitable Use Restriction could be lifted in the future and testified that her

determination that the Property could be used for residential purposes was

informed by this Court's prior approval of sales of the neighboring Flynn Lots,

free and clear of the Charitable Use Restriction.

TCLP disagrees averring that the sale of the Flynn Lots free and clear of

the Charitable Use Restriction is not instructive here as the Flynn Lots were

permitted to be sold free and clear of the Charitable Use Restriction due, in

large part, to the non-objection from the Office of the Attorney General for the

Commonwealth of Pennsylvania ("PA Attorney General").

At trial, Counsel for TCLP represented, without presenting any testimony

or evidence in support thereof, [8] that the PA Attorney General had not indicated

---

[8] Further demonstrating the disclosure issues plaguing both Parties in this matter, at the July 24th trial, TCLP's Counsel asked the Court as to whether it would like to hear from Mark Turner, who TCLP had indicated possessed information regarding the likelihood of the PA Attorney General's willingness to permit the sale of the Property free and clear of the Charitable Use Restriction. Park Restoration objected on the basis that Mr. Turner had not been identified as a witness prior to trial:

| MS. LOFGREN: | No further questions for Mr. Glowacki. I just ask whether or not the Court would like to hear from Mr. Turner as to any factual statements that underlie the reasonableness of determining whether the charitable use restriction may be lifted. |
|---|---|
| MR. MIZNER: | Your Honor, he was not listed on the witness list and – |
| THE COURT: | It's – I'm not trying the case. It's your case. |

a willingness to permit the sale of the Property free and clear of the Charitable

Use Restriction. However, even assuming that an objection from the PA

Attorney General would be made, TCLP failed to articulate any legal basis for

its contention that such objection would preclude the lifting of the Charitable

Use Restriction.  Instead, TCLP requested judicial notice of the motions seeking

sale of the Flynn Lots wherein TCLP avers that the lifting of the Charitable Use

Restriction would be permissible. And in such motions, the non-objection of

the PA Attorney General was indicated as a factor in favor of approval. <u>See</u> <u>e.g.</u>

*Debtor's Mot. for Entry of an Order Approv'g the Sale of Real Prop. Designated as*

*Lot No. 5 in Lakefront Subdivision No. 1 Free and Clear of All Liens, Claims,*

*Encumbrances, and Interests, Including All Charitable Use Restrictions*, 14-

11277-JAD, ECF No. 318.

For its part, the Court clarified at the July 24th trial that the sales of the

Flynn Lots were approved free and clear of the Charitable Use Restriction not

because this Court had adjudged such lifting of the Charitable Use Restriction

to be warranted under the circumstances, but because no objection to the sale

motions, which requested "free and clear" transfers, had been filed.

---

| MS. LOFGREN: | We didn't update the witness list with the continued hearing and this was not a part of the initial factual dispute. |
|---|---|
| MR. MIZNER: | I have a right to know who the witnesses are and what they're going to testify about. |
| THE COURT: | You do. We do. All right. Thank you. Any other witnesses? |

July 24th Transcript 89-90.  Following this exchange, TCLP did not formally call Mr. Turner or any other witness. The Court would also note that to the extent Mr. Turner's testimony would have relayed to the Court details of discussions between Mr. Turner and the PA Attorney General, such testimony would constitute hearsay.

Consequently, the Court had not previously ruled upon the merits of whether the Charitable Use Restriction should be lifted. Thus, the Court's granting of the prior sale motions should not be interpreted as favoring or disfavoring the lifting of the Charitable Use Restriction herein.

As the Court is without information as to whether there would be any objection to the sale of the Property, and as there has been no prior adjudication on the merits as to whether the Charitable Use Restriction should be lifted, the Court could only speculate as to whether the Property could be sold free and clear of the Charitable Use Restriction over the objection of the PA Attorney General.

However, the Court does note that TCLP's averment that the necessity of the Property for carrying-out the purpose of the Charitable Use Restriction would inhibit the sale of the Property free and clear is at odds with TCLP's prior submissions to this Court.

During the May 17th hearing, Counsel for TCLP stated on the record that the Property was designated as a "core" area of TCLP's property, subject to the Charitable Use Restriction, and as such, the Property would be unfit for residential use. In elucidating this argument, Counsel, on cross-examination, presented Gillette with an enlarged copy of the Conneaut Lake Land Use Map ("Land Use Map"), which had been attached to TCLP's *Joint Plan of Reorganization Dated July 28, 2016* ("Plan"),[9] and directed Gillette's attention to

---

[9] 14-11277-JAD, ECF No. 427.

the area of the map colored "pink."[10] When the relevance of the evidence was
called into question, Counsel stated:

> Counsel:     The relevance is to show that [the Property is] in what we've
> designated as a pink core area of the park operations, and
> it's subject to a charitable use restriction that we likely
> cannot lift and that would make it not feasible for residential
> use. And so the comparison with the lakefront lots that we
> were able to sell free and clear of the charitable use
> restriction so that you could build residential unit on it,
> that's not a good comparison.

May 17th Transcript at 53. Further, after describing the Charitable Use
Restriction generally, Counsel for TCLP stated:

> Counsel:     . . . The point being that the Trustees of Conneaut Lake Park
> are specifically required to provide public access to the
> lakeshore, that the property where the Beach Club used to
> sit occupies that pink area which is primarily designated for
> lakeshore access. And so the possibility of us being able to
> lift the charitable use restriction in order to sell this for
> residential use is highly unlikely.

May 17th Transcript at 57. However, this classification of the Property as being
"core" and necessary to carry out the purpose of the Charitable Use Restriction
is directly contradicted by the language of TCLP's Plan, which was confirmed
by order of court on September 6, 2016. See *Order Approving Disclosure
Statement and Confirming Joint Am. Plan of Reorganization Dated July 28, 2016*,
14-11277-JAD, ECF No. 442.

---

[10] This portion of the Land Use Map appears in a pinkish-purple hue.   During cross-
examination, Counsel for TCLP referred to this portion as being highlighted in pink, whereas
the Plan describes this same area as being colored purple. This area will be referred to
interchangeability as pink or purple in direct citations to the May 17, 2017 hearing transcript
and the Plan.

Under the terms of the Plan, the Property, which is referred to as the "Beach Club Site" is designated as a "Noncore Parcel" not necessary for TCLP's "core business operations or to realize the overall charitable purpose for which the Real Property was put into charitable trust." Specifically, the Plan defined the term "Beach Club Site" as:

> **"Beach Club Site"** means the land on which the former Beach Club lay situate and designated within the purple area on the Conneaut Lake Park Land Use Plan.

See Plan 4, ¶ 2.15. The Plan also defined the term "Noncore Parcel" as:

> **"Noncore Parcel"** means, singularly and collectively, each parcel of Real Property that, in the Debtor's view, is **not necessary for the Reorganized Debtor's core business operations or to realize the overall charitable purpose** for which the Real Property was put into charitable trust. The Debtor has identified the Noncore Parcels in light green, bearing Numbers 1 through 4 in the Conneaut Lake Park Land Use Plan attached hereto as Schedule 2.25, as well as the **Beach Club Site** and Hotel Conneaut designated in purple[11] in the Conneaut Lake Park Land Use Plan.

See Plan 8, ¶ 2.56 (emphasis added).

In the Plan, TCLP includes the Beach Club Site as being one of six Noncore Parcels which could be potentially sold to satisfy the Plan obligations. See Plan 20, §7.01.  The Plan does note however, that as of the time of the Plan's filing, the PA Attorney General had not indicated that it would not object to the sale of the Property free and clear of the Charitable Use Restriction, as it

---

[11] The language of the Plan indicates that both the Beach Club Site (i.e. the Property) and Hotel Conneaut are designated in the purple portion of the Land Use Map.  However, based on the evidence presented at trial, it appears that while the Beach Club Site is located in the pinkish-purple section, Hotel Conneaut is situate in the much darker blue-purple portion. Nonetheless, both the Beach Club Site and Hotel Conneaut are each identified by name as being a "Noncore Parcel."

had for the Flynn Lots.[12] See Plan 21. However, it also does not state that the PA Attorney General would object and TCLP failed to introduce at trial any persuasive evidence demonstrating that such objection would be made. In fact, the record to date is that the PA Attorney General has simply not objected to sales of Noncore Parcels.[13]  These facts render Park Restoration's expert appraisal by Gillette more persuasive than the Glowacki appraisal obtained by TCLP. As such, the preponderance of the evidence is that the post-fire fair market value of the Property exceeds its pre-fire fair market value of $622,000. Consequently, TCLP has not sustained its burden of proof.

## IV.

For the reasons above, this Court finds that the preponderance of the evidence is that TCLP has not proven that it incurred damages and relief is denied as to Count I of the *Complaint* only.   An appropriate order shall be issued in accordance herewith.

Dated: December 15, 2017

**JEFFERY A. DELLER**
Chief United States Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**
Jeanne S. Lofgren, Esq.
John F. Mizner, Esq.

---

[12] In the event of an objection, the Plan provides that TCLP would seek a free of clear sale of the Property (as a Noncore Parcel) under the doctrine of *cy pres*. See Plan 21.

[13]  By the conclusion of the trial of this matter, the Court had approved the sales of lakefront Lot Nos. 2, 3, 4, and 5 without objection of the PA Attorney General. See 14-11277-JAD, ECF Nos. 356, 358, 444, 478, 521, and 525.